IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. *5:10-CR-58-MTT* |
| v. | : | |
| | : | VIOLATIONS: |
| MICHAEL EDWARD TODD, | : | 18 U.S.C. § 371 |
| THE PARTS GUYS, LLC, | : | 22 U.S.C. § 2778 |
| HAMID SEIFI, a/k/a "Hank Seifi", | : | 22 C.F.R. Part 127.1 |
| GALAXY AVIATION SERVICES, | : | 50 U.S.C. § 1705 |
| SYED AMIR AHMED NAJFI, | : | 31 C.F.R. Part 560 |
| ALETRA GENERAL TRADING, | : | 18 U.S.C. § 1956 |
| d/b/a "Erman & Sultan Trading Co.", | : | 18 U.S.C. § 1001 |
| LUC TEULY, | : | 18 U.S.C. § 2 |
| PHILIPPE SANCHEZ, | : | 18 U.S.C. § 981(a)(1)(C) |
| AEROTECHNIC, | : | 18 U.S.C. § 982(a)(1) |
| HASSAN SEIFI, | : | |
| REZA SEIFI, and | : | |
| SABANICAN COMPANY | : | |

THE GRAND JURY CHARGES:

## GENERAL ALLEGATIONS

At all times material to this indictment:

### The Defendants

1.      THE PARTS GUYS, LLC ("THE PARTS GUYS") is a company located in Port Orange, Florida, that maintains a warehouse at the Middle Georgia Municipal Airport in Macon, Georgia, which is operated, at least in part, for the purpose of procuring United States origin military aircraft parts on behalf of prohibited end-users in Iran.

2.      MICHAEL EDWARD TODD (hereinafter "TODD") is a United States national and the President of THE PARTS GUYS.  As President, TODD is responsible for the day-to-day operations of THE PARTS GUYS.

3.     GALAXY AVIATION SERVICES (hereinafter "GALAXY") is a company located in St. Charles, Illinois, which is operated, at least in part, for the purpose of procuring United States origin military aircraft parts on behalf of prohibited end-users in Iran.

4.     HAMID SEIFI, also known as HANK SEIFI (hereinafter "HANK"), is an Iranian born United States national and the President of GALAXY.  As President, HANK is responsible for the day-to-day operations of GALAXY.

5.     ALETRA GENERAL TRADING,   (hereinafter "ALETRA") is a company located in Dubai, United Arab Emirates (U.A.E.), which is operated, at least in part, for the purpose of procuring United States origin military aircraft parts for transshipment to Iran. In and around 2009, ALETRA was doing business as Erman & Sultan Trading Co.

6.     SYED AMIR AHMED NAJFI, (hereinafter "NAJFI"), is an Iranian national and a Purchaser for Aletra General Trading.  As Salesman, NAJFI is responsible for the day-to-day procurement of aircraft parts for Aletra in Dubai, UAE.

7.     AEROTECHNIC is a company located in Pinsaguel, France, which is operated, at least in part, for the purpose of procuring United States origin military aircraft parts for transshipment to Iran.

8.     PHILIPPE SANCHEZ (hereinafter "SANCHEZ") is a French national and the President of AEROTECHNIC.  As President, SANCHEZ is responsible for the day-to-day operations of AEROTECHNIC.

9.     LUC TEULY (hereinafter "TEULY") is a French national and the Sales Manager of AEROTECHNIC.  As Sales Manager, TEULY is responsible for the day-to-day sales for AEROTECHNIC.

2

10.     SABANICAN COMPANY ("SABANICAN") is a company located in Tehran, Iran, which is operated, at least in part, for the purpose of procuring United States origin military aircraft parts on behalf of end-users in Iran.  On at least one publically available website, SABANICAN purports to be a company that deals in "[a]viation military equipments."  Other publically viewable websites make clear SABANICAN's connection with the country of Iran.

11.     HASSAN SEIFI (hereinafter "HASSAN") is an Iranian national and the President of SABANICAN.  As President, HASSAN is responsible for the day-to-day sales and operations of SABANICAN.  HASSAN and HANK are brothers.

12.     REZA SEIFI (hereinafter "REZA") is an Iranian national and the Managing Director of SABANICAN.   As Managing Director, REZA also is responsible for the day-to-day sales and operations of SABANICAN.  REZA is HANK and HASSAN's nephew.

### The Arms Export Control Act

13.     In furtherance of world peace and the security and foreign policy of the United States, the Arms Export Control Act ("AECA") (Title 22, United States Code, Section 2778) authorizes the President of the United States ("the President") to control the export of "defense articles" by designating items, such as military aircraft and military aircraft components, on the United States Munitions List. (the "Munitions List").

14.     The Arms Export Control Act and its attendant regulations, the International Traffic in Arms Regulations ("ITAR") (Title 22, Code of Federal Regulations, Sections 120-130),  require a person to apply for and obtain a validated export license from the Directorate of Defense Trade Controls ("DDTC") of the United States Department of State before exporting arms, ammunition, or articles of war, which are all classified as defense

articles, from the United States. (Title 22, United States Code, Sections 2778(b)(2) and 2794(3), and 22 C.F.R. Section 120.1).   The ITAR also prohibits the export or attempt to export from the United States of any defense article for which a license or written approval is required.  (22 C.F.R. Section 127.1)

15.     In the application for an export license, the exporter is required to state, among other things, the nature of the armaments to be exported, the end recipient of the armaments, and the purpose for which the armaments are intended.  These factors and others assist the Office of Munitions Control in determining whether the export of the armaments would further the security and foreign policy interests of the United States or would otherwise affect world peace.

16.     The defense articles which are subject to such licensing requirements are designated on the Munitions List . Those designations are made by the State Department with concurrence of the Defense Department. (Title 22, United States Code, Section 2778(a)(1), and 22 C.F.R. Section 120.2).

17.     The Bell AH-1 is an attack helicopter flown by the Iranian Army.  The United Arab Emirates military does not fly the Bell AH-1 attack helicopter.

18.     The J85 military aircraft engine is a single-shaft turbo jet engine.  The J85 is used on a variety of military aircraft, including the F-5 fighter jet.

19.     The T53 engine is a turboshaft engine for helicopters.  The T53 is used on a variety of military helicopters, including the Bell AH-1 attack helicopter and UH-1 Huey attack helicopter.

20.     Category VIII(h) of the Munitions List includes military aircraft parts (22 C.F.R. §121.1).  The following aircraft parts have been certified by the DDTC as being

4

"defense articles" on Category VIII(h) of the Munitions List: (i) modular hydraulic unit for the Bell AH-1 attack helicopter (Part Number 88700-1) and (ii) rod-end bearings for the Bell AH-1 attack helicopter (Part Number 204-076-428-1).

21.    It is the policy of the United States to deny licenses with respect to the export of defense articles whenever an export would not be in furtherance of world peace and the security and foreign policy of the United States. (22 C.F.R. Section 126.1).

22.    At all times relevant to this indictment, Defendants TODD, THE PARTS GUYS, NAJFI, and ALETRA did not apply for, receive, or possess a license to export defense articles of any description.

<u>The Iran Trade Embargo and the Iranian Transactions Regulations</u>

23.    The International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1706, authorizes the President to impose economic sanctions on a foreign country in response to an unusual or extraordinary threat to the national security, foreign policy, or economy of the United States when the President declares a national emergency with respect to that threat.

24.    On March 15, 1995, the President issued Executive Order 12957, finding that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States," and declared "a national emergency to deal with that threat."  Executive Order 12957, as expanded and continued by Executive Orders 12959 and 13059 and successive Presidential notices, was in effect at all times relevant to this Indictment.

25.    On May 6, 1995, the President issued Executive Order 12959 and imposed economic sanctions, including a trade embargo, against Iran ("the Iran Trade Embargo").

On August 17, 1997, the President issued Executive Order 13059, renewing the Iran Trade Embargo, which continued throughout the time of the acts set forth herein.

26.     To implement the Iran Trade Embargo, the United States Department of the Treasury, through the Office of Foreign Assets Control ("OFAC"), issued the Iranian Transactions Regulations ("ITR") (31 C.F.R. Part 560).  With certain limited exceptions not applicable here, the ITR prohibit, among other things, the export, re-export, sale, or supply, directly or indirectly, from the United States or by a United States person wherever located, to Iran or the Government of Iran, or the financing of such export, re-export, sale, or supply, of any goods, technology, or services, without prior authorization from OFAC.  These regulations further prohibit any transactions that evade or avoid or have the purpose of evading or avoiding any of the prohibitions contained in the ITR, including the unauthorized exportation of goods from the United States to a third country if the goods are intended or destined for Iran.

27.     The Iran Trade Embargo and the ITR were in effect at all times relevant to this Indictment.

28.     At all times relevant to this Indictment, Defendants TODD, THE PARTS GUYS, HANK, GALAXY, SANCHEZ, TEULY, AEROTECHNIC, HASSAN, REZA, and SABANICAN did not apply for, receive, or possess a license or authorization from OFAC to export goods, technology, or services, of any description, to Iran.

<u>Export and Shipping Records</u>

29.     Pursuant to United States law and regulations, exporters, shippers, and freight forwarders are required to file certain forms and declarations concerning exports of goods and technology from the United States. Typically, those documents are filed

electronically through the Automated Export System, which is administered by the United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement.

30.     A Shipper's Export Declaration ("SED") is an official document submitted to DHS in connection with export shipments from the United States. Exporters, shippers, and freight forwarders are required to file an SED for every export of goods or technology from the United States with a value of $2,500 or more. (15 C.F.R. Section 758.1; 15 C.F.R. Section 30.2)

31.     An essential and material part of the SED, as well as other export filings, is information concerning the end-user or ultimate destination of the export. The identity of the end-user may determine whether the goods may be exported: (a) without any specific authorization from the United States Government; (b) with the specific authorization or license from the United States Department of State or the United States Department of Treasury; or (c) whether the goods may not be exported from the United States.

32.     The SED is used by the Department of State, the Department of the Treasury, and the Department of Commerce for export control purposes. Other United States government agencies also rely upon the information provided by Automated Export System records.

## COUNT ONE
### (Conspiracy to violate AECA, IEEPA, and Defraud the United States)

33.     The allegations in Paragraphs 1 through 32 are incorporated and realleged by reference in this Count.

7

34.     Beginning as early as in or about November 2008, the exact date being unknown to the Grand Jury, and continuing through in or about January 2010, in the Middle District of Georgia and elsewhere, the defendants,

**MICHAEL EDWARD TODD,**
**THE PARTS GUYS, LLC**
**HAMID SEIFI (a/k/a HANK),**
**GALAXY AVIATION SERVICES,**
**SYED AMIR AHMED NAJFI,**
**ALETRA GENERAL TRADING,**
**LUC TEULY,**
**PHILIPPE SANCHEZ,**
**AEROTECHNIC,**
**HASSAN SEIFI,**
**REZA SEIFI, and**
**SABANICAN COMPANY**

did knowingly and willfully combine, conspire, confederate, and agree with each other, and with others known and unknown to the Grand Jury, to commit offenses against the United States, that is,

(a)  to export and cause to be exported from the United States to a place outside thereof, defense articles, that is military aircraft parts, which were designated as defense articles on the United States Munitions List, without first obtaining from the Department of State, DDTC, a license or written authorization for such export, in violation of Title 22, United States Code, Section 2778(b)(2), and Title 22, Code of Federal Regulations, Sections 123.1 and 127.1;

(b) to export and cause the exportation of goods from the United States to Iran in violation of the embargo imposed upon that country by the United States (referenced in paragraphs 23 to 28), without having first obtained the required licenses or authorizations from the Department of the Treasury, OFAC, in violation of Title 50, United States Code,

8

Sections 1702 and 1705(a), and Title 31, Code of Federal Regulations, Sections 560.203 and 560.204; and

(c) to defraud the United States Department of the Treasury, the United States Department of State, and the United States Government by interfering with and obstructing a lawful government function by deceit, craft, trickery, and dishonest means in violation of Title 18, United States Code, Section 371.

## OBJECTS OF THE CONSPIRACY

35.    The objects of the conspiracy were:

A.    to illegally enrich the conspirators by unlawfully exporting military aircraft parts from the United States to Iran and the United Arab Emirates ("UAE");

B.    to evade the prohibitions and licensing requirements of AECA, the ITAR, IEEPA, and the ITR;  and,

C.    to conceal the prohibited activities and transactions from detection by the United States Government so as to avoid penalties and disruption of the illegal activity.

## MANNER AND MEANS OF THE CONSPIRACY

36.    The manner and means by which the defendants and their conspirators sought to accomplish the objects of the conspiracy included, among others, the following:

A.    Defendants TODD, HANK, NAJFI, TEULY, SANCHEZ, HASSAN, REZA, and others employed by THE PARTS GUYS, GALAXY, ALETRA, AEROTECHNIC, and SABANICAN, used email accounts and other forms of communication to communicate with each other, with other conspirators, and with other individuals located in the United States, U.A.E., France and Iran.

B.      Defendants NAJFI and ALETRA sent requests for quotes on behalf of conspirators and others to Defendants TODD and THE PARTS GUYS for purchases of military aircraft parts located in the United States.

C.      Defendants NAJFI and ALETRA placed orders and purchased aircraft parts located in the United States on behalf of conspirators and others from Defendants TODD and THE PARTS GUYS.

D.      Defendants NAJFI and ALETRA caused funds to be used in purchasing the military aircraft parts from Defendant TODD and THE PARTS GUYS in the United States.

E.      Defendant TODD and other conspirators attempted to and did cause the export of  military aircraft parts from the United States to a conspirator in the U.A.E.

F.      Defendant HANK sent requests for quotes on behalf of Defendants TUELY, SANCHEZ, AEROTECHNIC, HASSAN, REZA, SABANICAN and other conspirators located in Iran to Defendant TODD and THE PARTS GUYS for purchases of military aircraft parts located in the United States.

G.      Defendant HANK placed orders and purchased aircraft parts located in the United States on behalf of Defendants TUELY, SANCHEZ, AEROTECHNIC, HASSAN, REZA, SABANICAN, and other conspirators located in Iran from Defendant TODD and THE PARTS GUYS.

H.      Defendant HANK caused funds to be used for the purchase of military aircraft parts on behalf of Defendants TUELY, SANCHEZ, AEROTECHNIC, HASSAN, REZA, SABANICAN, and other conspirators located in Iran from Defendant TODD and THE PARTS GUYS in the United States.

I.      Defendant TODD and other conspirators caused the aircraft parts to be exported from the United States to individuals and entities in Iran by way of Defendants TUELY, SANCHEZ, and AEROTECHNIC in France without obtaining a license from the Office of Foreign Asset Controls, U.S. Department of the Treasury.

J.      Defendants TODD and SANCHEZ made and caused to be made materially false, misleading, and incomplete information to be placed in documents such as Shipper's Export Declarations.

## OVERT ACTS

37.     In furtherance of this conspiracy, and to accomplish its purpose and object, at least one of the conspirators committed and caused to be committed, in the Middle District of Georgia, and elsewhere, at least one of the following overt acts, among others:

### Modular Hydraulic Units for Bell AH-1 Attack Helicopter

(1)     On or about November 12, 2008, TODD emailed NAJFI, representative of the Dubai, U.A.E. company ALETRA, about new protocols for internationally shipping aircraft-related products. TODD informed NAJFI that he needed a special license from the State Department, Commerce Department, and the Directorate of Munitions Office to export some of the items requested by NAJFI. Such licenses, he acknowledged, would require information on the ultimate end-user.

(2)     On or about November 13, 2008, NAJFI responded to TODD with an email stating that it was hard for him to reveal his client's information because "as you know they are not the end user at all, but a company who is selling items to end users."

(3)     On or about November 14, 2008, NAJFI emailed TODD a request for price for four modulation hydraulic units.

11

(4)     On or about November 24, 2008, TODD emailed NAJFI and asked NAJFI for assurance that if the government ever audited TODD, NAJFI would provide him with the end-use information.

(5)     On or about December 2, 2008, TODD emailed NAJFI to apologize for the delay on an unrelated shipment, but stated that it was the only way to export the items out of the country without information about the end-user.

(6)     On or about January 18, 2009, TODD emailed NAJFI a quotation for modular hydraulic units (Part Number 88700-1) for the Bell AH-1 attack helicopter, quoting $3,000 for each overhauled part. Attached to the email was an invoice that recorded the sale of four modular hydraulic units for a total purchase price of $12,000 from THE PARTS GUYS to ALETRA, doing business as Erman & Sultan Trading Co.

(7)     On or about January 22, 2009, TODD emailed NAJFI, wherein TODD informed NAJFI that he would be unable to procure certain items without an export license due to military applications of those items. TODD asked NAJFI whether he would be able to provide end-use information, including the end-use business and tail number of the end-use aircraft.

(8)     On or about January 27, 2009, TODD emailed NAJFI and informed him that two of the four modular hydraulic units were no longer available for purchase. Attached to the email was a new invoice that recorded the sale of two modular hydraulic units for a total purchase price of $6,000 from THE PARTS GUYS to ALETRA.

(9)     On or about February 12, 2009, NAJFI sent TODD an email wherein he agreed to pay TODD $5,000 immediately, with the remainder to be paid with within 30 days of receipt.

(10)    On or about February 12, 2009, NAJFI emailed TODD and requested that TODD notify him as soon as the wired funds were received in the United States and requested additional quotes for other unrelated parts.  The wired funds were payment for the two modular hydraulic units.

(11)    On or about February 17, 2009, TODD's bank account reflected a transfer of approximately $5,000 from ALETRA.

(12)    On or about March 10, 2009, TODD received an email from Federal Express confirming the filing of an Shipper's Export Declaration ("SED").  On or about March 12, 2009, the SED was filed with the Automated Export System.  The shipment was described simply as aviation parts valued at $6,000 from THE PARTS GUYS to ALETRA and falsely listed the items as non-military aircraft parts, falsely listed that end-user was ALETRA, and falsely listed that no license was required.

(13)    On or about March 25, 2009, TODD emailed NAJFI to notify him that the package was temporarily detained by United States Customs.

(14)    On or about March 27, 2009, TODD emailed NAJFI a new Federal Express tracking number for the released shipment.

(15)    On or about March 27, 2009, a review of the Automated Export System showed that a shipment of aviation parts valued at $6,000 was shipped from THE PARTS GUYS to ALETRA.  The shipment description on the declaration falsely listed the items as non-military aircraft parts, falsely listed that end-user was ALETRA, and falsely listed that no license was required.  Federal Express documents show a confirmed shipment arrived in Dubai, U.A.E., on April 1, 2009.

13

(16)    On or about April 8, 2009, NAJFI emailed TODD and stated that he had wired the remaining balance owed to TODD for the two modular hydraulic units.  The next day, TODD's bank account reflected a transfer of approximately $1,475 from ALETRA.

<u>Electronic Contacts and Rod-End Bearings for Bell AH-1 Attack Helicopter</u>

(17)    On or about April 12, 2009, NAJFI emailed TODD a request for a pro forma invoice for three hundred and sixty-three (363) electronic contacts and six rod-end bearings for the Bell AH-1 attack helicopter.

(18)    On or about April 12, 2009, TODD responded to NAJFI with an email which contained two attached documents.  The first document was the invoice listing THE PARTS GUYS as the seller and ALETRA as the purchaser. The invoice listed the sale of three hundred and sixty-three (363) electronic contacts and six rod-end bearings for the price of $21,228.  The second attached document provided the banking information of THE PARTS GUYS.

(19)    On or about April 14, 2009, NAJFI emailed TODD in order to confirm that a down payment of $15,000 would be made in advance and the remaining balance, $6,228, would be paid within thirty days (totaling $21,228).  The following day, TODD sent his confirmation.

(20)    On or about April 17, 2009, TODD received approximately $15,000 in his bank account from ALETRA.

(21)    On or about April 19, 2009, NAJFI emailed TODD a document that showed a total of $15,000 deposited into TODD's bank account from ALETRA.

(22)    On or about June 23, 2009, TODD emailed NAJFI to notify him that he had found the requested rod-end bearings, but that the vendor was holding the units until

14

TODD acquired an export license.  TODD indicated he was attempting to obtain an export license for the rod-end bearings, as well as the electronic contacts, and that he might be able to do so by using information from another end-user as a substitute for the Dubai trading company.  TODD expressed frustration that ALETRA would not reveal the actual end-user of the products to TODD.

(23)    On or about June 24, 2009, NAJFI emailed TODD, wherein NAJFI stated that he did not have direct contact with the end-user and, for that reason, could not provide a "solid answer."

(24)    On or about October 6, 2009, TODD responded to NAJFI and requested that NAJFI arrange to pick up the products at TODD's warehouse located in Macon, Georgia. In his email, TODD specifically cautioned NAJFI that export licences had not been obtained and, without the licences, the items could not lawfully be exported from the United States. TODD also indicated that he would like an end-user certificate that would detail the use of the export controlled products domestically, all the while knowing that the items were intended for end-users outside of the United States.

(25)    On or about October 10, 2009, NAJFI emailed TODD and requested that TODD provide him with the exact location of his warehouse and stated a freight forwarding company could handle the shipment.

(26)    On or about October 15, 2009, TODD emailed NAJFI wherein TODD again expressed his frustration, stating that the United States government would not "look lightly" on ALETRA's attempt to export military components from the United States.

(27)    On or about October 17, 2009, NAJFI emailed TODD and stated that, if TODD was concerned with risk, he could instead send the items to an address in Hong

Kong, rather than Dubai, U.A.E.  Absent that, NAJFI requested that TODD send him a picture of the boxes at the warehouse, provide a document that would detail the contents of the boxes, and provide an address, so that a pick up could be arranged.

(28)   On or about November 8, 2009, TODD emailed NAJFI his warehouse address and requested that they agree on a date and time for the pick up.

(29)   On or about November 18, 2009, NAJFI emailed TODD in order to notify TODD that a named courier would be in contact and would arrange to pick up the items between November 20 and 29, 2009.

(30)   On or about November 25, 2009, NAJFI emailed TODD a copy of an invoice that listed three hundred and sixty-three (363) electronic contacts and six rod-end bearings with a total listed value of $21,228.

(31)   On or about December 15, 2009, noting that the export restricted articles had not yet been picked up by the courier, TODD emailed NAJFI.  TODD suggested that they include certain less restricted "dual-use" parts in the shipment container in order to obscure the military components and conceal the true nature of the shipment from law enforcement detection.

(32)   On or about January 7, 2010, NAJFI emailed TODD to confirm that TODD would meet with the courier the following day and that NAJFI would likewise confirm with the courier the pick up arrangement.

(33)   On or about January 8, 2010, TODD emailed both the courier and NAJFI and requested that the attached documents be signed.  Upon confirmation that the paper work was received, TODD stated that the parts would be released into the courier's custody.

(34)   Between on or about January 11 to June 22, 2010, NAJFI continued to attempt to obtain the rod-end bearings from TODD.

<u>Nozzles, Bearing Rollers, and Transmitters for Military Aircraft Engines</u>

(35)   On or about March 2, 2009, HASSAN, President of the Iranian company SABANICAN, emailed TEULY, the representative of the French trading company AEROTECHNIC, a purchase order for twenty (20) aircraft parts with applications for the J85 military aircraft engine and the T53 military helicopter engine, with an overall value of $138,940.  The purchase order contained the company name "Sabanican" and provided a billing and shipping address located in Tehran, Iran.

(36)   Additionally, the email from HASSAN stated that the seller in the United States requested full payment before shipment.  HASSAN also stated that the cash on delivery option should not be an issue based on the good relationship the two companies enjoyed over the past two years. HASSAN further stated that if the cash on delivery option was available, AEROTECHNIC would receive an additional 5% profit for a total commission of 15% for this shipment.

(37)   On or about March 3, 2009, HANK, President of GALAXY and HASSAN's brother, emailed TODD and requested that TODD create a pro forma invoice for $138,940, obtain the parts, and arrange for shipment to AEROTECHNIC.

(38)   On or about March 3, 2009, HANK emailed TODD and requested that TODD send him a signed agreement confirming that TODD would send a pro forma invoice to AEROTECHNIC for the 20 aircraft parts.

(39)   On or about March 3, 2009, TODD sent HANK an email that contained several attachments. The first attachment contained TODD's banking information for the

17

incoming wire transfer from overseas. The second attachment contained the agreement requested by HANK which stated, among other things, that the balance of the money will be sent to vendors for purchase of additional parts per an instruction from GALAXY and shall remain available until such time that the instructions were received.   The third attachment was an invoice which listed the twenty (20) aircraft parts valued at $138,940 sold, purportedly, to AEROTECHNIC.   The parts requested were six (6) bearing rollers (Part Number 5020T26P03), four (4) bearing rollers, annular (Part Number 5040T17P01), seven (7) transmitters (Part Number 4010T15P01), and three (3) nozzles (Part Number 1-110-520-19).

(40)    On or about March 9, 2009, HANK emailed TODD a message that contained detailed instructions on which companies in the United States to contact for certain parts, and the target prices for each of those parts.  Based on the quotes provided in the email and the shipment invoice valued at $138,940, the remaining available funds totaled $78,077.

(41)    On or about March 9, 2009, an employee of AEROTECHNIC emailed HASSAN a document that would serve as a confirmation for the order.   The document listed the aircraft parts valued at 109,764.58 euro (approximately $138,940).   The seller on the document was AEROTECHNIC in France and the buyer was SABANICAN in Tehran, Iran.

(42)    On or about March 10, 2009, TODD emailed one of his employees and requested an update on the nozzle parts.

(43)    On or about March 11, 2009, the employee emailed TODD and asked if all of the listed items were ordered by persons in Iran.

18

(44)    On or about March 11, 2009, TODD emailed his employee and stated that only a portion of the items were destined for Iran.

(45)    On or about March 12, 2009, TODD emailed HANK to notify him that the funds for the orders were only partially available, but that most of the orders had been placed and the remaining in stock items would be ordered the following day. Additionally, TODD requested that HANK approve the nozzle order at a price of either $8,300 for overhauled condition or $16,000 for new items.

(46)    On or about March 12, 2009, TODD received a wire transfer from AEROTECHNIC for $138,940 into his bank account.

(47)    On or about March 13, 2009, TODD emailed HANK a finance report, which recorded the wire transfer from AEROTECHNIC for $138,940, and calculated a total commission of $15,000 that was to be set aside for GALAXY.

(48)    On or about March 16, 2009, TEULY emailed HASSAN in Iran in order to inform HASSAN that AEROTECHNIC would receive a partial shipment from THE PARTS GUYS and that TEULY needed to be instructed on how to ship the items to HASSAN in Iran.

(49)    On or about March 16, 2009, HASSAN emailed TEULY a document that referenced the shipment from TODD, and stated that the items must be of United States origin, must be insured, and they must be shipped from France to Iran by Iran Air.

(50)    On or about March 16, 2009, TEULY emailed HASSAN in Iran asking for the complete address of Iran Air and stated that the goods would be sent to Iran Air's freight forwarder in Toulouse, France.

(51)   On or about March 16, 2009, SABANICAN forwarded HANK a group of emails which referenced AEROTECHNIC's purchase order.

(52)   On or about March 17, 2009, HANK emailed TODD and requested that TODD transfer the $15,000 commission to a named person in Canada.

(53)   On or about March 17, 2009, TODD sent a $15,000 wire transfer from his account to the identified person in Canada.

(54)   On or about March 17, 2009, TODD emailed AEROTECHNIC to provide an update on the order and reported that certain units had already been shipped from the United States companies to THE PARTS GUYS, but that some of the items must first go to TODD's warehouse to be readied for export.

(55)   On or about March 18, 2009, HANK's wife sent an email to HASSAN at SABANICAN expressing disappointment over some of HANK's personal problems.  The email also explicitly described the business relationship between HANK and REZA from SABANICAN and indicated that the relationship began during HANK's last visit to Iran. The email further detailed an arrangement with an unnamed French individual who was to act as a middle man in accordance with the agreement.

(56)   On or about March 23, 2009, TEULY emailed TODD and HASSAN and requested a further update on the shipment.  Therein, TEULY stated that his Iranian customer had called him three times that day and had requested the same update.

(57)   On or about March 24, 2009, TODD emailed TEULY with an update of the order, and stated that all the items, with the exception of the nozzles and one bearing, were currently in transit or had been delivered to his warehouse.

(58)    On or about March 25, 2009, an SED was filed with the Automated Export System that recorded a Federal Express shipment from THE PARTS GUYS in Georgia to AEROTECHNIC in France valued at $138,000.  The shipment description listed as "other parts of military airplanes/helicopters" and falsely indicated that there was no license required.

(59)    Federal Express records reveal that the shipment left the United States on or about March 26, 2009, and arrived in France on or about March 30, 2009.

(60)    On or about March 31, 2009, TEULY emailed TODD in order to inform him that the first shipment was sent to the Iranian customer and requested that TODD keep him informed of the other pending purchase orders.

(61)    On or about April 15, 2009, REZA emailed TEULY and requested that AEROTECHNIC give SABANICAN $200,000 of credit in order to keep the flow of purchase orders moving more quickly.

(62)    On or about April 15, 2009, SANCHEZ, a second representative of AEROTECHNIC, responded to REZA, with a copied message to TEULY, and stated that he would be pleased to give a credit line of $200,000 to SABANICAN.

(63)    On or about June 10, 2009, HANK was blind copied on an email from HASSAN to AEROTECHNIC and REZA that contained multiple attachments in the form of emails regarding the shipment of the aviation parts with a beginning date of March 2, 2009, from SABANICAN.  These parts were the same parts valued at $138,940 and many of the emails are the very emails referenced above.

(64)    On or about June 10, 2009, REZA emailed TEULY and SANCHEZ and set out   the   agreement   between   AEROTECHNIC   and   SABANICAN,   specifically

21

AEROTECHNIC would be paid a 15% commission if the company finances the purchase of the parts and that, for any part that is purchased by SABANICAN or by other vendors and shipped to AEROTECHNIC for immediate forwarding to Iran, AEROTECHNIC would receive only 5%.

(65)   On or about June 10, 2009, TEULY emailed REZA and informed him that AEROTECHNIC would also take a 15% commission for fronting the purchase price for all the parts from THE PARTS GUYS.

(66)   On or about June 10, 2009, TEULY emailed  HASSAN, REZA, TODD, and SANCHEZ, wherein he stated that he had corrected the mark-up of 15% and 5% on the last items and that additional freight charges were added for the shipment from Toulouse, France to Tehran, Iran.

(67)   On or about June 11, 2009, SANCHEZ emailed TODD, REZA, HASSAN, and TEULY, and stated that AEROTECHNIC would transfer $60,000 to Todd's account immediately.  Thereafter, as SANCHEZ stated, AEROTECHNIC would transfer another $50,000 to TODD's account as soon as there was proof of a wire transfer in the same amount from SABANICAN to AEROTECHNIC.

(68)   On or about June 11, 2009, SANCHEZ instructed TODD to prepare a statement that would falsely claim that all parts delivered by TODD were for civilian aircraft.

(69)   On or about June 11, 2009, REZA forwarded the same preceding email to HANK and HASSAN.

(70)   On or about August 16, 2009, HASSAN sent TODD an email, copying REZA and HANK, implicitly acknowledging receipt of the three (3) nozzles (Part Number 1-110-

22

520-19), and explaining that his "client" had issues with the nozzles because they were not new.

All in violation of Title 18, United States Code, Section 371, Title 22, United States Code, Section 2278, and Title 50, United States Code, Section 1705(a).

## COUNT 2
### (Violation of the Arms Export Control Act)

38.     The allegations in Paragraphs 1 through 37 are incorporated and realleged by reference in this Count.

39.     On or about March 27, 2009, in the Middle District of Georgia and elsewhere, the defendants,

**MICHAEL EDWARD TODD,
THE PARTS GUYS, LLC,
SYED AMIR AHMED NAJFI, and
ALETRA GENERAL TRADING**

did knowingly and willfully export, from the United States to the United Arab Emirates, two modular hydraulic units for the Bell AH-1 attack helicopter (P/N 88700-1), which are designated as defense articles in Category VIII(h) of the United States Munitions List, without having first obtained from the United States Department of State, Directorate of Defense Trade Controls, a license for such exports or written authorization for such exports, all in violation of Title 22, United States Code, Section 2778(b)(2) and (c), Title 22, Code of Federal Regulations, Sections 123.1 and 127.1, and Title 18, United States Code, Section 2.

## COUNT 3
### (Violation of the Arms Export Control Act)

40.    The allegations in Paragraphs 1 through 37 are incorporated and realleged by reference in this Count.

41.    On or about March 27, 2009, in the Middle District of Georgia and elsewhere, the defendants,

**MICHAEL EDWARD TODD,
THE PARTS GUYS, LLC,
SYED AMIR AHMED NAJFI, and
ALETRA GENERAL TRADING**

did knowingly and willfully attempt to export from the United States six rod-end bearings for the Bell AH-1 attack helicopter (P/N 204-076-428-1), which are designated as defense articles in Category VIII(h) of the United States Munitions List, without having first obtained from the United States Department of State, Directorate of Defense Trade Controls, a license for such exports or written authorization for such exports, all in violation of Title 22, United States Code, Section 2778(b)(2) and (c), Title 22, Code of Federal Regulations, Sections 123.1 and 127.1, and Title 18, United States Code, Section 2.

## COUNTS 4-7
### (Violations of the Iran Embargo)

42.    The allegations in Paragraphs 1 through 37 are incorporated and realleged by reference in these Counts.

43.    On or about the dates listed as to each count below, in the Middle District of Georgia and elsewhere, the defendants listed as to each count below, did knowingly and willfully violate the embargo against Iran by attempting to export and causing to be exported military aircraft parts, as described more fully below in Counts 4 through 7, from

the United States to Iran, by way of France, without having first obtained the required

authorizations from the United States Department of the Treasury's Office of Foreign

Assets Control:

| COUNT | DEFENDANTS | APPROX. DATE OF EXPORT | PARTS |
|:---:|:---:|:---:|:---|
| 4 | MICHAEL EDWARD TODD, THE PARTS GUYS, LLC HAMID SEIFI (a/k/a HANK), GALAXY AVIATION SERVICES, LUC TEULY, PHILIPPE SANCHEZ, AEROTECHNIC, HASSAN SEIFI, REZA SEIFI, and SABANICAN COMPANY | 3/25/09 | 6 bearing rollers (P/N 5020T26P03). |
| 5 | MICHAEL EDWARD TODD, THE PARTS GUYS, LLC HAMID SEIFI (a/k/a HANK), GALAXY AVIATION SERVICES, LUC TEULY, PHILIPPE SANCHEZ, AEROTECHNIC, HASSAN SEIFI, REZA SEIFI, and SABANICAN COMPANY | 3/25/09 | 4 bearing rollers, annular (P/N 5040T17P01). |

| COUNT | DEFENDANTS | APPROX. DATE OF EXPORT | PARTS |
|---|---|---|---|
| 6 | MICHAEL EDWARD TODD, THE PARTS GUYS, LLC HAMID SEIFI (a/k/a HANK), GALAXY AVIATION SERVICES, LUC TEULY, PHILIPPE SANCHEZ, AEROTECHNIC, HASSAN SEIFI, REZA SEIFI, and SABANICAN COMPANY | 3/25/09 | 7 transmitters (P/N 4010T15P01). |
| 7 | MICHAEL EDWARD TODD, THE PARTS GUYS, LLC HAMID SEIFI (a/k/a HANK), GALAXY AVIATION SERVICES, LUC TEULY, PHILIPPE SANCHEZ, AEROTECHNIC, HASSAN SEIFI, REZA SEIFI, and SABANICAN COMPANY | 3/25/09 | 3 nozzles (P/N 1-110-520-19). |

All in violation of Title 50, United States Code, Sections 1702 and 1705(a),
Executive Orders 12957, 12959, and 13059, and Title 31, Code of Federal Regulations,
Sections 560.203 and 560.204, and Title 18, United States Code, Section 2.

## COUNT 8
(False Statements)

44.    Paragraphs 1 through 37 of this Indictment are incorporated and realleged
by reference in this Count.

26

45.    On or about March 27, 2009, in the Middle District of Georgia and elsewhere, the defendants,

**MICHAEL EDWARD TODD and
SYED AMIR AHMED NAJFI**

in a matter within the jurisdiction of the executive branch of the United States Government, that is, the Department of Homeland Security, Immigration and Customs Enforcement, and the United States Department of Commerce, did knowingly and willfully make and cause to be made materially false, fictitious and fraudulent statements and representations, in that the defendants, aiding and abetting one another in the same, stated and represented, and caused to be stated and represented, in shipping records, Automated Export System records, and Shipper's Export Declaration, relating to the shipment of 2 modular hydraulic units for a Bell AH-1 attack helicopter, that (i) no license was required ("NLR") and (ii) the ultimate consignee was ALETRA, when the defendants there and then knew that these statements were false, and a license was required for the shipment, all in violation of Title 18, United States Code, Sections 1001 and 2.

## COUNT 9
(False Statements)

46.    Paragraphs 1 through 37 of this Indictment are incorporated and realleged by reference in this Count.

47.    On or about March 25, 2009, in the Middle District of Georgia and elsewhere, the defendants,

**MICHAEL EDWARD TODD and
PHILIPPE SANCHEZ**

in a matter within the jurisdiction of the executive branch of the United States Government, that is, the Department of Homeland Security, Bureau of Immigration and Customs Enforcement, and the United States Department of Commerce, did knowingly and willfully make and cause to be made materially false, fictitious and fraudulent statements and representations, in that the defendants, aiding and abetting one another in the same, stated and represented, and caused to be stated and represented, in shipping records, Automated Export System records, and Shipper's Export Declaration, relating to the shipment of Nozzles, Bearing Rollers, and Transmitters for military aircraft engines, that (i) no license was required ("NLR") and (ii) the ultimate consignee was AEROTECHNIC located in France, when the defendants there and then knew that these statements were false, a license was required for the shipment, and the ultimate destination for the goods was Iran, all in violation of Title 18, United States Code, Sections 1001 and 2.

### COUNTS 10-12
(Money Laundering)

48.    Paragraphs 1 through 37 of this Indictment are incorporated and realleged by reference in these Counts.

49.    On or about the dates set forth below, in the Middle District of Georgia and elsewhere,

**MICHAEL EDWARD TODD,
THE PARTS GUYS, LLC,
SYED AMIR AHMED NAJFI, and
ALETRA GENERAL TRADING**

unlawfully, wilfully, and knowingly did transport, transmit, and transfer, and attempt to transport, transmit, and transfer, a monetary instrument and funds, as described more fully

28

below for each count, to a place in the United States from a place outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit, illegally exporting and causing the export of defense articles from the United States to the United Arab Emirates without having first obtained the required licenses for such exports from United States Department of State licenses, in violation of Title 22, United States Code, Section 2778(b)(2) and (c), Title 22, Code of Federal Regulations, Sections 121.1, 123.1, 127.1:

| COUNT | APPROX. DATE | APPROX. AMOUNT OF FUNDS |
|:-----:|:------------:|:-----------------------:|
| 10 | 2/17/2009 | $5,000.00 |
| 11 | 4/09/2009 | $1,475.00 |
| 12 | 4/17/2009 | $15,000.00 |

All in violation of Title 18, United States Code, Sections 1956(a)(2)(A) and 2.

### COUNT 13
(Conspiracy to Commit Money Laundering)

50.     Paragraphs 1 through 37 of this Indictment are incorporated and realleged in this Count.

51.     On or about March 12, 2009, in the Middle District of Georgia and elsewhere, the defendants,

**MICHAEL EDWARD TODD,
THE PARTS GUYS, LLC
HAMID SEIFI (a/k/a HANK),
GALAXY AVIATION SERVICES,
LUC TEULY,
PHILIPPE SANCHEZ,
AEROTECHNIC,
HASSAN SEIFI,
REZA SEIFI, and**

29

**SABANICAN COMPANY**

did unlawfully, wilfully, and knowingly combine, conspire, and agree with each other and

with other persons known and unknown to the Grand Jury to commit offenses against the

United States in violation of Title 18, United States Code, Section 1956, specifically, to

transport, transmit, and transfer, and attempt to transport, transmit, and transfer, a

monetary instrument and funds, specifically $138,940, to a place in the United States from

a place outside the United States, with the intent to promote the carrying on of specified

unlawful activity, to wit, illegally exporting military aircraft parts from the United States to

Iran in violation of Title 50, United States Code, Section 1702 and 1705(a), and Title 31,

Code of Federal Regulations, Parts 560.203 and 560.204, all in violation of Title 18, United

States Code, Sections 1956(a)(2)(A) and (h).

### <u>FORFEITURE NOTICE</u>
(As to Counts 1 through 7)

52.     Paragraphs 1 through 43 of this Indictment are re-alleged and by this

reference fully incorporated herein for the purpose of alleging forfeiture pursuant to the

provisions of Title 18, United States Code Section 981 (a)(1)(C) and Title 28, United States

Code Section 2461.

53.     As a result of committing one or more of the offenses alleged in Counts 1

through 7 of this Indictment, in violation of Title 18, United States Code, Section 371, Title

50, United States Code, Section 1705(a), and Title 22, United States Code, Section

2778(b)(2), defendants,

**MICHAEL EDWARD TODD,**
**THE PARTS GUYS, LLC**
**HAMID SEIFI (a/k/a HANK),**

30

**GALAXY AVIATION SERVICES,
SYED AMIR AHMED NAJFI,
ALETRA GENERAL TRADING,
LUC TEULY,
PHILIPPE SANCHEZ,
AEROTECHNIC,
HASSAN SEIFI,
REZA SEIFI, and
SABANICAN COMPANY**

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981

(a)(1)(C) and Title 28, United States Code, Section 2461, all property, real and personal,

that constitutes or is derived from proceeds traceable to the commission of the offenses

alleged in Counts 1 through 7 of this Indictment, including but not limited to a sum of

money representing the amount of proceeds obtained as a result of the offense.

## Substitute Assets Provision

54.    If any of the property subject to forfeiture, as a result of any act or

omission of the defendant(s):

(1) cannot be located upon the exercise of due diligence;

(2) has been transferred, sold to or deposited with, a third person;

(3) has been placed beyond the jurisdiction of the court;

(4) has been substantially diminished in value; or

(5) has been commingled with other property which cannot be subdivided without

difficulty;

the United States of America shall be entitled to forfeiture of substitute property, pursuant

to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States

Code, Section 2461(c).

31

## FORFEITURE NOTICE
(As to Counts 10 through 13)

55.    Paragraphs 1 through 51 of this Indictment are re-alleged and by this reference fully incorporated herein for the purpose of alleging forfeiture pursuant to the provisions of Title 18, United States Code, Section 982 (a)(1).

56.    As a result of committing the money laundering offenses alleged in Counts 10 through 13 of this Indictment, defendants,

**MICHAEL EDWARD TODD,
THE PARTS GUYS, LLC
HAMID SEIFI (a/k/a HANK),
GALAXY AVIATION SERVICES,
SYED AMIR AHMED NAJFI,
ALETRA GENERAL TRADING,
LUC TEULY,
PHILIPPE SANCHEZ,
AEROTECHNIC,
HASSAN SEIFI,
REZA SEIFI, and
SABANICAN COMPANY**

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982, all property, real and personal, involved in such offense and all property traceable to such property, including but not limited to, a sum of money representing the amount of property that was involved in the money laundering offenses or is traceable to such property.

### Substitute Assets Provision

57.    If any of the property subject to forfeiture, as a result of any act or omission of the defendant(s):

(1) cannot be located upon the exercise of due diligence;

(2) has been transferred, sold to or deposited with, a third person;

32

(3) has been placed beyond the jurisdiction of the court;

(4) has been substantially diminished in value; or

(5) has been commingled with other property which cannot be subdivided without

difficulty;

the United States of America shall be entitled to forfeiture of substitute property, pursuant

to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States

Code, Section 982(b)(1) and Title 28, United States Code, Section 2461(c).

A TRUE BILL.

_____

s/FOREPERSON OF THE GRAND JURY

Presented By:

_____
JENNIFER KOLMAN
ASSISTANT UNITED STATES ATTORNEY

RYAN P. FAYHEE
BRANDON L. VAN GRACK
TRIAL ATTORNEYS
NATIONAL SECURITY DIVISION
UNITED STATES DEPARTMENT OF JUSTICE

Filed in open court this 30ᵗʰ day of _____Sept_____, A.D. 2010.

_____
Deputy Clerk